In the Matter of EAST–WEST ASSOCIATES, a Limited Partnership, Debtor.

CARTERET SAVINGS BANK, F.A., Appellant,

v.

NASTASI–WHITE, INC., et al., Petitioning Creditors, Appellees.

No. 89 Civ. 1671 (KC).

United States District Court, S.D. New York.

Nov. 6, 1989.

Wachtell, Lipton, Rosen & Katz, Theodore Gewertz; Carb, Luria, Glassner, Cook & Kufeld, Stephen J. Fallis, Carol Duffy, New York City, for appellant.

Shaw, Licitra, Esernio & Schwartz, P.C., J. Stanley Shaw, Edward P. Frey, Jeffrey M. Zalkin; Albanese, Albanese & Fiore, Joseph A. Fiore, New York City, for appellees.

## AMENDED OPINION AND ORDER

CONBOY, District Judge:

Appellant Carteret Savings Bank, F.A., ("Carteret") appeals from two orders issued by the United States Bankruptcy Court for the Southern District of New York. The first order, issued on January 25, 1989, granted Carteret relief from the automatic stay imposed pursuant to 11 U.S.C. § 362, conditioned upon the "Petitioning Creditors'" (appellees Nastasi–White, Inc., Circle Industries Division, Argus Construction Corporation, and U.S.A. Contracting Corporation) failure to provide Carteret adequate protection of its interest in the mortgaged premises. The second order, issued on February 15, 1989, after Carteret had appealed the January 25, 1989 order (hereinafter, "Lift Stay Order"), suspended the making of adequate protection payments by the Petitioning Creditors to Carteret, and directed that the payment already made be refunded. For the reasons stated below, we remand to the Bankruptcy Court for further proceedings in accordance with this opinion.

## BACKGROUND

The complex history of this case begins in December, 1984, when Carteret and four other participating banks (collectively, "Carteret") made a $65 million construction

loan to the debtor, East–West Associates,[1] for the construction of a building located at 135 West 52nd Street, New York, New York. HRH Construction Corporation ("HRH") was the general contractor on the project, and Petitioning Creditors were three of HRH's subcontractors. The building contains 45 floors, is nearly completed, but remains wholly unoccupied. As a result of East–West's defaults under the construction loan, including its failure to make interest payments and pay real property taxes, Carteret commenced a foreclosure action in the Supreme Court of the State of New York in early 1987.

In March, 1987, the State Court appointed a receiver to maintain the building. In March, 1988, Carteret obtained a decision and order in the State Court action granting it summary judgment. The referee in the State Court Foreclosure Action determined that as of May 2, 1988, Carteret was owed principal and interest of almost $77 million. Although no official valuation of the building has been made, the building has apparently declined in value to approximately $50 to $60 million. To establish that it is undersecured, Carteret itself estimated the value of the building to be $55 to $60 million. Carteret's Proposed Findings of Fact and Conclusions of Law re: § 362(d) Relief and Other Motions at 16.

On May 26, 1988, Petitioning Creditors, who hold mechanics' liens against the property, commenced an involuntary Chapter 11 Bankruptcy proceeding, thereby invoking an automatic stay of the foreclosure proceedings pursuant to Section 362(a) of the Bankruptcy Code. On August 4, 1988, Carteret moved to lift the automatic stay. Carteret thereafter moved to dismiss the case in its entirety, pursuant to 11 U.S.C. § 1112, and the Petitioning Creditors moved for the appointment of a trustee or conversion to a Chapter 7 liquidation, pursuant to the same Code section.

In December, 1988, the Petitioning Creditors filed a proposed Liquidating Plan of Reorganization ("Proposed Plan") and a Funding Agreement, executed between the Petitioning Creditors and a "Joint Venture" consisting of Albanese Development Corporation, Breslin Realty Development Corporation and Gary Calmenson. This Proposed Plan provided for revaluation of Carteret's mortgage at $50 million, with a term of maturity three years from the date of the closing, $3.7 million for property taxes, interest and penalties, and payments to various other classes of creditors, including $2.3 million to the Petitioning Creditors.

After a protracted hearing on Carteret's motions to lift the stay and for dismissal, and the Petitioner's Creditors' motion to appoint a trustee or convert to Chapter 7, the Bankruptcy Court granted Carteret's motion for dismissal, unless Carteret received an adequate protection payment from the Petitioning Creditors in the sum of $871,416 on or before January 27, 1989, and $152,000 per month thereafter. On January 27, 1989, the Joint Venture posted the adequate protection payment, thereby extending the automatic stay and preventing Carteret from proceeding with foreclosure.

On February 9, 1989, after spending $38,000 of the $871,416 on receiver's expenses, Carteret appealed from the Lift Stay Order, on the grounds that the amount of adequate protection was inadequate, and that, in any event, the petition should have been dismissed and the stay lifted for various reasons, including lack of standing, bad faith filing, and lack of an effective reorganization plan. Six days later, the Bankruptcy Court, pursuant to Bankruptcy Rule 8005, issued its order directing the return of the adequate protection payment already posted, and staying all future adequate protection payments. This order (hereinafter, "Rule 8005 Order") ostensibly was intended to preserve the status quo as of Carteret's appeal of the Lift Stay Order.

---

1. East–West Associates is not a party to this action. East–West's principal debtor, Jacobo Finkielstain, is currently under indictment by the United States Attorney's Office for the Southern District of New York. Reply Brief of Appellant on Appeal from the United States Bankruptcy Court for the Southern District of New York ("Reply Brief on Lift Stay Order") at 8.

Arguing that the Rule 8005 Order should be vacated for lack of subject matter jurisdiction, Carteret immediately moved for an order to show cause in this Court, which was signed by Judge Ward on February 17, 1989. Judge Ward's order essentially stayed the proceedings and preserved the status quo as of the Rule 8005 Order. It provided for the remaining $833,416 to be paid to the Joint Venture and placed in escrow, and for Carteret to post an undertaking in the amount of $100,000 to reimburse the Joint Venture for any damages sustained by it, including the sum of $38,000 already spent by Carteret. On March 3, 1989, the parties entered into a stipulation before Judge Patterson, embodying the decretal paragraphs of Judge Ward's order, and providing for Carteret's appeal of the Rule 8005 Order to be consolidated with its appeal of the Lift Stay Order, on an expedited briefing schedule. The consolidated appeal is now before us.

## DISCUSSION

### I. THE LIFT STAY ORDER

Carteret appeals from the Lift Stay Order for three main reasons: 1) the petition should have been dismissed because the Petitioning Creditors lack standing and acted in bad faith (see 11 U.S.C. § 1112(b)); 2) Carteret's interest in the collateral is not adequately protected, because the adequate protection order does not provide for interest on accruing real estate taxes, insurance, and certain receiver's expenses (see 11 U.S.C. § 362(d)(1)); and 3) the stay should have been lifted because there is no effective reorganization in prospect, as the Proposed Plan cannot be confirmed (see 11 U.S.C. § 362(d)(2)).

#### A. *Standing and Bad Faith*

Carteret argues that the Petitioning Creditors lack standing to file an involuntary petition against the debtor, East–West Associates, because they do not have claims "against the debtor," as required by the Bankruptcy Code. We reject at the outset the Petitioning Creditors' contention that the question of standing is not before the Court because it was not raised below. As the Petitioning Creditors themselves point out in supplemental papers submitted to the Court, standing was addressed in the very early stages of this proceeding in the Bankruptcy Court, on the first day of hearings on the motions to dismiss or lift the stay, and to appoint a trustee or convert to Chapter 7. See Transcript of Hearing,[2] August 24, 1988, at 6, 44–46; Letter Memorandum on the Standing Issue, dated October 26, 1989, at 2. Standing was also addressed at the closing arguments. See Transcript of Hearing, January 12, 1989, at 1229.

Section 303(b) of the Code, which governs the filing of involuntary cases, provides in relevant part:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

Thus, in order to be eligible, a petitioning creditor must have a claim (as defined in Section 101(4) of the Code) that meets the following requirements:

(a) is against "such person," i.e., the debtor;

(b) is not contingent as to liability;

(c) is not the subject of a bona fide dispute;

(d) is either unsecured or, when added to the claims of other eligible petitioning creditors, aggregates $5,000 in unsecured amount.

---

**2.** We will use "Transcript of Hearing, (date)" to refer to the transcript of the proceedings before the Bankruptcy Court.

*See,* 2 *Collier on Bankruptcy,* ¶ 303.08 (15th ed. 1989). Carteret argues that the Petitioning Creditors do not meet the first and fourth requirements.

Petitioning Creditors hold mechanics' liens, which claims, under New York law, are limited to the debtor's property specified in the notice of lien. New York Lien Law § 24. Since, under the Bankruptcy Code, a claim against the debtor includes a claim against the property of the debtor, 11 U.S.C. § 102(2), it seems that the Petitioning Creditors are eligible under Section 303(b). Carteret argues, however, that because the Petitioning Creditors' waived $5,000 of their secured mechanics' liens to meet the fourth requirement, that they be creditors with claims aggregating $5,000 in unsecured amount, and because the Petitioning Creditors' claims are non-recourse, the Petitioning Creditors in effect waived their claims against East–West and are no longer eligible.

 A secured creditor may waive all or part of its secured claim to become an eligible unsecured petitioning creditor under Section 303(b). *See* 2 *Collier on Bankruptcy,* ¶ 303.08[5] (15th ed. 1989); *In re Wm. J. Braun Builders, Inc.,* 262 F.2d 107 (6th Cir.1958); *Missco Homesteads Ass'n v. United States,* 185 F.2d 280, 282 (8th Cir. 1950); *Mount Vernon Hotel Co. v. Block,* 157 F.2d 637 (9th Cir.1946); *In re Central Illinois & Refining Co.,* 133 F.2d 657, 658–59 (7th Cir.1943); *In re Automatic Typewriter & Service Co.,* 271 F. 1, 3 (2d. Cir.1921); *In the Matter of Gibraltar Amusements, Ltd.,* 187 F.Supp. 931, 934–35 (E.D.N.Y.1960); *In re Meyers,* 31 F.Supp. 636 (E.D.N.Y.1940); *In re All Media Properties, Inc.,* 5 B.R. 126, 141 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981). In none of these cases, however, does it appear that the secured claim waived by the creditor is a non-recourse claim. Carteret argues that the fact that the Petitioning Creditors' claims are non-recourse is fatal to their standing, because once the security is waived, the creditors are left with no claim against the debtor.

We decline to accept this bootstrapping argument. The Bankruptcy Code makes no distinction between recourse and non-recourse claims; in fact, as Carteret points out, a claim "against the debtor" under the Bankruptcy Code, 11 U.S.C. § 102(2), includes both claims against the debtor and claims against the property. Appellant's Post–Argument Brief on Eligibility of Appellees to be Petitioning Creditors at 4. Moreover, Petitioning Creditors' released $5,000 each of their unsecured claims, thereby retaining the remainder of their mechanics' liens on the property. *See In re Wm. J. Braun Builders, Inc.,* 262 F.2d 107 (6th Cir.1958) (fully secured creditor may elect to waive only the dollar amount necessary to validate the involuntary petition and have that waiver ineffective as to the balance of the secured claim). We therefore find, as a matter of law, that the Petitioning Creditors meet the requirements of Section 303(b).

 On the question of bad faith, Carteret argues that the petition should have been dismissed for cause because it was not filed in good faith. Courts have recognized that, pursuant to Section 1112(b) of the Code, which provides for conversion or dismissal of a case for "cause," a bankruptcy court may dismiss a petition for lack of good faith. *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984); *In re Consulting Actuarial Partners, Limited Partnership,* 72 B.R. 821, 826–27 (Bankr.S.D.N.Y.1987); *In re Cardi Ventures,* 59 B.R. 18, 21–22 (Bankr.S.D.N.Y.1985). The good faith inquiry "has been refined to require inquiry as to whether the debtor has any assets, real debts and real creditors, *In re Eden Associates,* 13 B.R. [578, 585 (Bankr.S.D.N.Y.1981)], and whether the debtor is abusing the jurisdiction of the bankruptcy court. *In re Johns–Manville Corp.,* 36 B.R. [727, 737 (Bankr.S.D.N.Y. 1984), *appeal dismissed,* 39 B.R. 234 (S.D.N.Y.1984)]." *In re Cardi Ventures,* 59 B.R. at 22.

Circumstantial factors which would support a dismissal for lack of a good faith filing include: (1) the debtor has only one asset, the property; (2) the debtor has few

unsecured creditors whose claims are small in relation to the claims of the secured creditors; (3) the debtor has few employees; (4) the property is the subject of a foreclosure action as a result of arrearages on the debt; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights. *See In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394–95 (11th Cir.1988) (citing cases). Because several of these circumstances are present in this case, including that the property is the debtor's sole asset, that the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors, that the petition was filed shortly before the foreclosure action, and that the debtor has few employees, Carteret urges the Court to dismiss the petition for lack of a good faith filing.

In response, Petitioning Creditors point out that the Bankruptcy Court implicitly acknowledged that the petition was filed in good faith by granting the unofficial committee of mechanics' lienholders the status of an official committee. Order Directing Appointment of an Official Committee of Mechanics' Lienholders Pursuant to 11 U.S.C. § 1102(a)(2), February 22, 1989. In addition, at the beginning of the proceedings before the Bankruptcy Court, that Court explicitly found that the filing was not made in bad faith. The transcript reads as follows:

> Nevertheless, having read all of the briefs and certain portions of the briefs which deal with good faith, bad faith in the filing, I cannot agree with the attorneys for the secured creditors that bad faith or lack of good faith is a genuine issue here in respect to the filing of the involuntary.
>
> \* \* \* \* \* \*
>
> Here we do have and I do see a creditor seeking to vindicate its stake in the Debtor's estate.
>
> I don't find that that, per se, is bad faith.

Transcript of Hearing, August 24, 1988, at 44, 46.

■ We are unwilling to disturb the Bankruptcy Court's finding. Even though some of the circumstances which may evince a bad faith filing are present in this case, the Bankruptcy Court, which considered those circumstances and the credibility and motives of the Petitioning Creditors, believed the filing to have been made in good faith. This finding is supported by the record, which indicates that the Petitioning Creditors have come forward with a reorganization plan. The possibility of an effective reorganization is not dispositive of the question of good faith, *In re Phoenix Piccadilly,* 849 F.2d at 1395, however, we believe that it does reflect favorably on the Petitioning Creditors' efforts and motives.[3] Accordingly, we decline to dismiss the petition for lack of a good faith filing.

### B. *Adequate Protection*

The Bankruptcy Court conditioned the automatic stay on the payment to Carteret of a lump sum of $871,416 on January 27, 1989, followed by monthly payments of $152,000. Carteret contends that these payments are inadequate to protect its interest in the property because they do not cover certain expenses, including interest on accruing real estate taxes ($19,000 per month), insurance ($8,000 per month), and receiver's bond ($1,000). Thus, Carteret concludes, the stay should have been lifted, or adequate protection payments increased, pursuant to 11 U.S.C. § 362(d)(1).

■ Section 362(d)(1) of the Bankruptcy Code provides as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

---

**3.** We also note that the Bankruptcy Court apparently spent considerable time on the question of whether Carteret was acting in bad faith in refusing to accept the Proposed Plan. The

Bankruptcy Court concluded that it did not have enough evidence before it to find that Carteret was acting in bad faith. Transcript of Hearing, January 12, 1989, at 1318–21.

Under this provision, a secured creditor has the right to receive protection for any decline in the value of the collateral during the automatic stay. *United States Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 629–30, 98 L.Ed.2d 740 (1988).

The $152,000 per month adequate protection payments ordered by the Bankruptcy Court include $112,000 per month for ad valorem property taxes and $40,000 per month for receiver's expenses. Since Carteret, in its proposed findings of fact and conclusions of law and at the closing arguments, asked for $176,000 per month, it seems that the main issues concern the monthly interest payments on real estate taxes and the insurance payments of $8,000 per month.[4]

■ Carteret is not entitled to receive protection for pre-petition interest payments on real estate taxes, as the underlying principal accrued before the automatic stay went into effect. A more difficult question is presented by the post-petition interest on real estate taxes. Since Carteret is entitled to principal payments on real estate taxes in the amount of $112,000 per month during the automatic stay, it would seem that it is also entitled to adequate protection for the interest accruing on unpaid real estate taxes during the stay. Clearly, the interest on the accruing real estate taxes increases the City of New York's tax lien on the premises along with the principal, thereby decreasing the value of Carteret's lien on the premises, which is junior to the City's tax lien. Accordingly, Carteret is entitled to be compensated for this decline in the value of its collateral. *See, e.g., In re Liona Corp, N.V.*, 68 B.R. 761, 767 (Bankr.E.D.Pa.1987) (interest and penalties on unpaid taxes, plus imposition

of lien for unpaid current taxes results in inadequate protection); *In re Pittman*, 7 B.R. 760 (Bankr.S.D.N.Y.1980) (secured creditor lacked adequate protection where debtor had failed to pay real estate taxes); *In re El Patio, Ltd.*, 6 B.R. 518, 522 (Bankr.C.D.Ca.1980) (preservation of property requires payment for accruing taxes and penalties, since accruing property taxes as a lien ahead of the bank erodes the value of the secured interest).

In its final order, however, the Bankruptcy Court explicitly did not provide for accrued interest on the amount of base real estate taxes in the adequate protection payment due on January 27, 1989. Final Judgment and Order Granting Carteret Savings Bank, F.A. Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362, Conditional Upon the Petitioning Creditors' Failure to Provide Carteret Adequate Protection of Its Interest in the Mortgaged Premises ("Lift Stay Order") at 3. Accordingly, we remand to the Bankruptcy Court for a determination of the appropriate amount of interest due on the tax principal during the stay,[5] which amount should be added to the lump sum payment to Carteret.

■ On remand, the Bankruptcy Court should also provide Carteret compensation for insurance costs of $8,000 per month, which would increase the monthly payments to $162,000 per month. A secured creditor is entitled to receive insurance costs as part of adequate protection. *See Greives v. Bank of Western Indiana (In re Greives)*, 81 B.R. 912, 970 (Bankr.N.D.Ind.1987); *In re Pittman*, 7 B.R. 760, 763 (Bankr.S.D.N.Y.1980); *In re Tucker*, 5 B.R. 180, 184 (Bankr.S.D.N.Y.1980). The cost of insurance during the stay should also be added to the lump sum payment.

Thus, with respect to adequate protection, the lump sum payment should include insurance costs and interest on taxes which

---

**4.** Carteret's quibble over the receiver's bond of $1,000 per month, an insignificant amount, cannot be taken seriously, especially because the Bankruptcy Court awarded $40,000 for receiver's expenses, $3,000 more than Carteret requested.

**5.** This amount would seem to be $121,520, computed as follows:

$112,000 for seven months = $784,000, at an interest rate of 15.5% per year[*] = $121,520.

[*] According to Carteret, New York City Council Resolution No. 1406 of June 30, 1988 set an interest rate of 15.5% per year to be charged for the nonpayment of real estate taxes, water rents, and sewer rents. Brief of Appellant on Appeal from the United States Bankruptcy Court for the Southern District of New York at 15, n. 6.

accrued during the stay. The monthly payments should include insurance costs as well.

## C. *Reorganization Plan*

In addition to arguing that it is not being adequately protected, Carteret contends in the alternative that the stay should have been lifted pursuant to 11 U.S.C. § 362(d)(2). This section provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
>
> (2) with respect to a stay of an act against property, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

Because Section 362(d)(2) is written in the disjunctive with Section 362(d)(1), a court must provide relief from the automatic stay either if adequate protection is not being provided or if the debtor has no equity in the property and the property is not necessary to an effective reorganization.

Carteret argues that because there is no effective reorganization in prospect, the Bankruptcy Court should have terminated the stay under Section 362(d)(2). By the strict language of the statute, the Bankruptcy Court may, upon finding that the elements of Section 362(d)(2) are met, condition the stay, just as the stay may be conditioned under Section 362(d)(1). Thus, some courts have held that, even if the grounds for relief under subsection (d)(2) are met, a creditor is not automatically entitled to have the stay lifted if the debtor is able to prove that the creditor is adequately protected under subsection (d)(1). See, e.g., *In re St. Peter's School,* 16 B.R. 404, 408 (Bankr.S.D.N.Y.1982). Thus, it may have been proper for the Bankruptcy Court to condition the stay on the Petitioning Creditors' providing Carteret adequate protection.

Courts have generally observed, however, that Section 362(d)(2) requires that an automatic stay be lifted unless there is a possibility of an effective reorganization. As the Supreme Court recently explained:

> Once the movant under § 362(d)(2) established that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." See § 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time." (citations omitted and emphasis in the original)

*United State Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). The logic of this interpretation of Section 362 is clear: it would not be desirable to have a debtor make adequate protection payments indefinitely if there is no prospect of the debtor being successfully reorganized. "The Bankruptcy Code does not sanction the stay for the stay's sake." M. Biesenstock, *Bankruptcy Reorganization* at 135 (1987).

As this Court has recognized, the language from *Timbers,* quoted above, is arguably dictum; however, the overwhelming majority of courts to face the issue, both before and after *Timbers,* has applied the "feasibility" test. *In re Ritz–Carlton of D.C., Inc.,* 98 B.R. 170, 172 (Bankr.S.D.N.Y.1989) (citing cases). The feasibility test does not require that the debtor show that its reorganization plan is confirmable, i.e., acceptable to its creditors. *Id.; First Agricultural Bank v. Jug End in the Berkshires, Inc. (In re Jug End in the Berkshires, Inc.),* 46 B.R. 892, 902 (Bankr.D. Mass.1985); *Barclays Bank of New York v. Saypol (In re Saypol),* 31 B.R. 796, 803 (Bankr.S.D.N.Y.1983). A court may, how-

ever, analyze the debtor's plan "using the feasibility test as a guidepost ... because [the plan] provides the bases for determining whether the debtor can successfully reorganize." *In re National Real Estate Limited Partnership II*, 87 B.R. 986, 990–91 (Bankr.E.D.Wisc.1988). "The test thus is 'whether the things which are to be done after confirmation can be done as a practical matter.'" *In re Ritz–Carlton*, 98 B.R. at 172 (quoting *In re Fenske*, 96 B.R. 244 (Bankr.D.N.D.1988) (citation omitted)).

In its Lift Stay Order, the Bankruptcy Court explicitly did not make any findings "regarding whether the mortgaged premises are necessary to an effective reorganization of the debtor." Lift Stay Order at 3. Accordingly, we remand to the Bankruptcy Court for such a finding.[6]

## II. RULE 8005 ORDER

Carteret next appeals from the Rule 8005 Order, which stayed adequate protection payments and directed the return of the payment already made. Carteret argues that the Bankruptcy Court did not have jurisdiction to enter this order, as Carteret's appeal to this Court divested the Bankruptcy Court of its jurisdiction. Petitioning Creditors respond that the Bankruptcy Court was simply preserving the status quo as of the appeal.

Because we are remanding this case to the Bankruptcy Court for further proceedings, the jurisdictional question raised by the Rule 8005 Order has effectively been rendered moot. In support of the Bankruptcy Court's action, however, we observe that, had we found in this appeal that the stay should have been lifted for lack of a prospect of an effective reorganization, Carteret would not have been entitled to the adequate protection payment. Put another way, if, as Carteret argues on appeal it should have done, the Bankruptcy Court had lifted the stay, the Bankruptcy Court would not, at the same time, have awarded

Carteret adequate protection. Instead, the petition would have been dismissed, and Carteret would have been able to proceed with foreclosure.

On remand, the Bankruptcy Court must first determine whether, applying the feasibility test, there is an effective reorganization in prospect. If there is no such prospect, the stay should be lifted, the petition should be dismissed, and the funds held in escrow returned to the Joint Venture. If there is such a prospect, the Bankruptcy Court must determine the amount of adequate protection Carteret is entitled to receive, in accordance with the "Adequate Protection" analysis above. See *supra* at 772–74. In addition, the Bankruptcy Court should determine whether Carteret is entitled to receive adequate protection payments for the time that has elapsed since Carteret itself appealed from the Lift Stay Order.

SO ORDERED.

---

6. We note that the Bankruptcy Court held extensive hearings on the motions before it. During these hearings, and also on this appeal, Carteret raised the issue of the Proposed Plan's confirmability. The Bankruptcy Court emphasized that it was focusing solely on the adequate protection issue, and not on the question of confirma-

bility. Transcript of Hearing, January 12, 1989, at 1332. Perhaps this focus implies that the Bankruptcy Court believed the Proposed Plan to be feasible. Faced with the explicit language of the Bankruptcy Court's Lift Stay Order, however, we are unwilling to draw such an inference from the proceedings below.